# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**TRAVIS BARRETT NAVE,**

      **Plaintiff,**

**vs.**                     **Case No. 4:15cv376-WS/CAS**

**DR. SCHLOFMAN,**
**DR. MACHADO-PELLOT,**
**DON WHITFIELD,**
**and J. WEBSTER,**

      **Defendants.**

_____/

## REPORT AND RECOMMENDATION

      Defendants Dr. Veronica Machado-Pellot, Dr. Jimmy Webster, and Don Whitfield filed a motion for summary judgment on April 19, 2016.   ECF No. 33.  Plaintiff was advised of his obligation to file a response, ECF No. 35, and Plaintiff's response was filed on June 20, 2016.  The motion is ready for a ruling.[1]

---

[1] Service was recently carried out on Dr. Schlofman and that Defendant filed a motion to dismiss on January 9, 2017.  ECF No. 52.  Plaintiff has been directed to file his opposition to that motion by February 10, 2017.  ECF No. 56.

**Allegations of the complaint, ECF No. 1**

Plaintiff's complaint challenges the sufficiency of medical care he received for complaints of eye pain, headaches, vertigo, and blurry vision. ECF No. 1.  While incarcerated in the Department of Corrections in early 2011, Plaintiff was provided "glasses with a heavy tint and solar shields" by Dr. Green.  *Id.* at 6-7.  Plaintiff had those glasses until he was transferred to Sumter Correctional Institution in 2013 and a security officer took the solar shields.[2]  *Id.* at 7.  Since that time, Plaintiff alleges that Defendants denied him replacement solar shields, failed to provide him appropriate care for his eyes, and failed to provide needed eye protection.  *Id.* at 7-9. Plaintiff alleges that he has been in pain and has not been "able to live a normal life."  *Id.* at 10-13.

**Legal standards governing a motion for summary judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish

---

[2] Plaintiff explains that "[s]olar shields are sunglasses that fit over glasses and provide full coverage of the eyes from light."  ECF No. 1 at 7.

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must then show[3] though affidavits or other Rule 56 evidence "that there is a genuine issue for trial," *Id.* at 325, 106 S. Ct. at 2554, and must specifically challenge the facts identified in the moving party's statement of undisputed facts.  Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

---

[3] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

An issue of fact is "material" if it could affect the outcome of the case.  Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Additionally, "the issue of fact must be 'genuine'" and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (other citations omitted).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Anderson, 477 U.S. at 249, 106 S. Ct. at 2511 (noting that a "scintilla of evidence" is not enough to refer the matter to a jury).  The Court must

decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)).  All "justifiable inferences" must be resolved in the light most favorable to the nonmoving party, Beard, 548 U.S. at 529, 126 S. Ct. at 2578 (noting the distinction "between evidence of disputed facts and disputed matters of professional judgment."),[4] but "only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoted in Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356 (other citation omitted).

---

[4]  Noting that deference must be given "to the professional judgment of prison administrators," the Court stated that "[u]nless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage."  Beard, 548 U.S. at 530, 126 S. Ct. at 2578 (citing Overton v. Bazzetta, 539 U.S. 126, 132, 123 S. Ct. 2162, 2167, 156 L. Ed. 2d 162 (2003)).

**The relevant Rule 56(e) evidence**

Plaintiff "has a long-standing diagnosis of toxoplasmosis infection of his right eye."  ECF No. 33-1 at 3 (Machado-Pellot Affidavit).[5]  "In the eye, toxoplasma infections frequently cause significant inflammation and subsequent scarring which may temporarily or permanently impair vision."  *Id.*  "Eye symptoms vary, but may include blurred vision or floaters during active disease."  *Id.*  "The condition usually resolves without treatment within a few months."  *Id.*  Dr. Machado-Pellot states that most cases "rarely require treatment," but she acknowledges that "encysted toxoplasma organisms can reactivate causing inflammation, pain, redness, sensitivity to light, blurred vision, and increased intraocular pressure."  *Id.*  Dr. Machado-Pellot further explains:

> The eye disease can reactivate months or years later, each time causing more damage to the retina.  If the central structures of the retina are involved there will be a progressive loss of vision that can lead to blindness.  The patient [Plaintiff] is blind in his right eye due to previous retinal scarring that had occurred.

ECF No. 33-1 at 3-4.

Plaintiff was transferred to Sumter Correctional Institution where Mr. Machado-Pellot was the medical director on September 18, 2013.  ECF

---

[5] Dr. Machado-Pellot is a medical doctor and "was formerly employed by Corizon, LLC as the Medical Director at the Sumter Correctional Institution."  ECF No. 33-1 at 1.

No. 33-1 at 4.  A month later, Plaintiff went to sick call for the renewal of medications and shoe insoles.  *Id.* (citing ECF No. 33-2 at 4).  He advised the nurse that security at Central Florida Reception Center "took away his solar shades but let him keep his sunglasses."  *Id.*  The nurse noted that Plaintiff "already has a pass for solar shades[6] and sunglasses issued" at another institution.  ECF No. 33-2 at 4.  The nurse indicated Plaintiff had reported the issue to the "impaired inmate committee" three weeks ago, but was unaware if anything was being done.  ECF No. 33-1 at 4 (citing ECF No. 33-2 at 4).  Plaintiff also told the nurse that he received "sunglasses seven months ago and was told that his blurry vision would clear up after having them a few months," but Plaintiff said his "vision was still blurry."  *Id.*

The nurse made a notation in Plaintiff's Chronological Record of Health Care that Plaintiff's chart would be referred to "provider" (Dr. Machado-Pellot) for renewal of Immodium and Excedrin, a new pair of size 12 insoles, new solar shades, and possible appointment with eye doctor for blurry vision.  ECF No. 33-2 at 4; *see also* ECF No. 33-1 at 4. On the following day, October 18, 2013, Dr. Machado-Pellot renewed his "Immodium and Excedrin prescriptions and asked the nurses to check

---

[6] Plaintiff was issued a pass for solar shields in 2011.  ECF No. 42 at 3.

[Plaintiff's] visual acuity prior to an optometry exam."  ECF No. 33-1 at 5 (citing ECF No. 33-2 at 4-5).

There is no evidence that anything happened over the next two months until Plaintiff went to sick call again on December 10, 2013.  ECF No. 33-1 at 5; ECF No. 33-2 at 5.  Among other issues, Plaintiff complained again that his solar shields had been taken.  ECF No. 33-2 at 5.  The nurse noted in Plaintiff's chart that it would be referred to Dr. Machado-Pellot "for a possible referral to an optometrist."  ECF No. 33-1 at 5; ECF No. 33-2 at 5.  On December 11, 2013, Dr. Machado-Pellot renewed Plaintiff's gluten free diet pass for 3 months.  ECF No. 33-2 at 5.  Another notation on December 23, 2013, reveals Plaintiff's chart was again referred "to MD" for review.  ECF No. 33-2 at 6.  Although not entirely legible, it also appears Plaintiff was again requesting "solar shields."  *Id.*

Plaintiff had an eye exam with a nurse at Sumter C.I. on January 10, 2014.  ECF No. 33-1 at 5; ECF No. 33-2 at 6.  Plaintiff was wearing glasses he had received in March 2013 and his visual acuity in the left eye was 20/70.  ECF No. 33-1 at 5.  Plaintiff "was unable to read the chart with his right eye."  *Id.*  The chart was again referred to Dr. Machado-Pellot for review.  ECF No. 33-2 at 6.

Dr. Machado-Pellot submitted an optometry consult for Plaintiff on January 14, 2014, noting his history of toxoplasmosis, vision of 20/70 in the left eye, and blindness in the right eye.  ECF No. 33-1 at 5; ECF No. 33-2 at 6.  The request was approved and Plaintiff was scheduled for an examination on March 26, 2014.  ECF No. 33-1 at 5.

In early February 2014, Plaintiff returned to sick call once again requesting renewal of his passes for sunglasses and solar shields and for Excedrin.  ECF No. 33-1 at 6; ECF No. 33-2 at 8.  Dr. Machado-Pellot states that she "renewed his passes so he would be able to wear them without delay if the optometrist approved and ordered them."  ECF No. 33-1 at 6; ECF No. 33-2 at 8.  The medical records also indicate Plaintiff "requested renewal of indoor job."  ECF No. 33-2 at 11.  The medical record is not entirely legible, but that request appears to be based on sensitivity to light.  *Id.*  The record indicates Dr. Machado-Pellot granted that request as well.  *Id.*

On March 26, 2014, Plaintiff was examined by an optometrist.[7]  ECF No. 33-1 at 6; ECF No. 33-2 at 9.  The optometrist noted Plaintiff's "corrected vision was 20/20 in the left eye" and Plaintiff was to continue with his current glasses prescription and have a follow-up in one year.  *Id.*

---

[7] The optometrist is not identified and the signature is not legible. ECF No. 33-2 at 9.

Dr. Machado-Pellot submitted another "consultation request for the one-year follow up exam and for the [Plaintiff] to be evaluated for solar shield need."[8]  ECF No. 33-1 at 6; *see also* ECF No. 33-2 at 10.  The follow-up appointment was scheduled for March 25, 2015.  ECF No. 33-1 at 6.

On April 4, 2014, Plaintiff submitted an "inmate request" form concerning his glasses.  ECF No. 33-1 at 6; ECF No. 33-2 at 12.  On April 16, 2014, Plaintiff asked to have his glasses rechecked, saying they were "not right."  ECF No. 33-2 at 12.  In late April, Plaintiff also requested a renewal of Excedrin.  *Id.*  In mid-May 2014, Plaintiff requested a "key lock pass renewal" which was renewed due to his "documented history of blindness" in his right eye and visual impairment of the left eye.  ECF No. 33-1 at 6-7.  Dr. Machado-Pellot asserts that none of his requests "involved complaints of photosensitivity suggesting that he needed sunglasses or solar shields."  ECF No. 33-1 at 7; *see also* ECF No. 33-2 at 13.

On August 14, 2014, Plaintiff submitted another inmate request for solar shields.  ECF No. 33-1 at 7; ECF No. 33-2 at 14.  Dr. Machado-Pellot indicates Plaintiff had requested solar shields from the optometrist, but his

---

[8] The first consultation request did not specifically include a request to evaluate Plaintiff's need for a solar shield.  *See* ECF No. 33-2 at 7.  That request was included in the second consultation request dated March 26, 2014, for which an appointment was made on March 25, 2015.  ECF No. 33-2 at 10.

request was denied.  ECF No. 33-1 at 7.  The medical records note that the inmate request was answered on August 15, 2014, but no information is given as to the answer provided.  ECF No. 33-2 at 15.

In late December 2014, Plaintiff went to sick call to have various passes renewed and for a refill of Excedrin.  ECF No. 33-2 at 16.  The request was granted.  *Id.*  On February 11, 2015, Plaintiff was again requesting pass renewal.  Dr. Machado-Pellot noted in Plaintiff's chart that he would be evaluated by the optometrist "to determine the medical need of solar shields."  ECF No. 33-1 at 7; *see* ECF No. 33-2 at 16.

Plaintiff was seen by the optometrist on March 25, 2015.  ECF No. 33-1 at 7; ECF No. 33-2 at 17.  Plaintiff's corrected vision in the left eye was 20/30.  *Id.*  The optometrist's assessment of Plaintiff included myopia, astigmatism, a history of toxoplasmosis, and noted Plaintiff was on medication for migraines.  ECF No. 33-2 at 17.  The optometrist "ordered a new prescription due to refractive error and a one-year follow up."  ECF No. 33-1 at 7.  On March 25, 2015, Dr. Machado-Pellot submitted two more "optometry consultation requests: one for the one-year follow up and one for a follow-up in two months per the optometrist's request."  ECF No. 33-1 at 8; *see also* ECF No. 33-2 at 18.

On April 8, 2015, Plaintiff submitted a formal grievance regarding the denial of tinted glasses and solar shields.  ECF No. 33-1 at 8.  The medical records indicate the grievance was answered by Dr. Machado-Pellot.  ECF No. 33-2 at 18.  She indicates the response advised Plaintiff "he did not qualify for those items."  ECF No. 33-1 at 8.  On May 20, 2015, Dr. Machado-Pellot left her employment with Corizon and had no further involvement with Plaintiff's care.  *Id.*

Dr. Machado-Pellot explains that a notation in Plaintiff's medical records indicates Plaintiff was seen by an optometrist on May 27, 2015.[9] ECF No. 33-1 at 8 (citing ECF No. 33-2 at 20).  The optometrist, whose signature is not legible, stated that solar shields were "not allowed" but said sunglasses could be purchased from the canteen "if allowed."  ECF No. 33-2 at 20;[10] *see also* ECF No. 33-1 at 8.

Dr. Machado-Pellot advised that the Department of Corrections "has a policy establishing uniform procedures for the provision of eye care to inmates."  ECF No. 33-1 at 8 (citing to Exhibit A-2, ECF No. 33-3).  The Department's policy concerning vision care in prison institutions is stated in

---

[9] This appointment appears to be for the 2 month follow-up appointment as directed at the March 25, 2015, optometrist appointment.  *See* ECF Nos. 33-1 at 7, 33-2 at 19.

[10] Plaintiff contends the doctor's notation states "Solar shields not allowed OK for sunglasses from Canteen if allowed."  ECF No. 42 at 4 (citing ECF No. 33-2 at 20).

Health Services Bulletin No: 15.02.10, which was filed as an exhibit.  ECF No. 33-3.  The effective date of the policy is April 9, 2014.  *Id.* at 1-4.

In relevant part, the policy states: "Inmates with an uncorrected visual acuity of 20/60 or worse in either eye will be referred to an optometrist."  ECF No. 33-2 at 1.  The policy also states that inmates who complain of blurred vision or pain in or around the eyes are to be "referred to the ophthalmologist for diagnosis and treatment."  ECF No. 33-3 at 1.  Additionally, the policy directs that "[g]lasses prescribed for inmates will not be tinted unless the inmate patient has a specific eye or systemic disease requiring a tint, such disease will be noted in the chart."  *Id.* at 3.

Dr. Machado-Pellot explained that "Corizon is required by contract to follow the FDOC's policy regarding eye care."  ECF No. 33-1 at 9.  She also declares that she "never ignored or disregarded the [Plaintiff's] medical needs."  ECF No. 33-1 at 9.  She states that she "referred him to an optometrist multiple times to be examined to determine his medical need for solar shields and sunglasses."  *Id.*  She explains that "[t]he optometrist determined the sunglasses and solar shields were not medically necessary because the patient's toxoplasmosis was not active and not causing any symptoms."  *Id.*  She states that although she renewed Plaintiff's "passes for sunglasses and solar shields" it was "so he

could wear them if approved." *Id.* Furthermore, she states that even if sunglasses or solar shields were not medically needed, Plaintiff could "still purchase sunglasses from the canteen and wear them." *Id.*

An affidavit was also submitted by Dr. Jimmy Webster. ECF No. 33-4 (Ex. B). Dr. Webster is "not a medical doctor and" does not "have medical training." *Id.* at 1. Rather, he has "a Ph.D. in Health Care Administration," is "a Certified Correctional Health Professional ('CCHP') by the National Commission on Correctional Health Care," and is "employed by Corizon Health as the Director of Operations for Florida Region 3." *Id.* at 1-2. Dr. Webster visits the prison facilities "from time to time" and recalls attending "an Impaired Inmate Committee meeting at Sumter" Correctional Institution. *Id.* at 2. Plaintiff "made a claim about the eye care service" and Dr. Webster told Plaintiff he "would ask the site Health Care Administrator to follow up with his claim and see if there [was] something we failed to do." *Id.* Dr. Webster states that "the optometrist found that sunglasses and solar shields were not medically necessary for" Plaintiff's condition. *Id.* Dr. Webster declares that "[b]ecause they were not medically indicated, there were not prescribed per policy." *Id.* He further states his understanding that Departmental "policy provides that prescription sunglasses will not be

received from the outside by package permit or any outside contact."  *Id.* at

3.  "Clip-on sunshades are available in the institutional canteens."  *Id.*

Don Whitfield, the Health Services Administrator at Sumter

Correctional Institution, also filed an affidavit.  ECF No. 33-5 (Ex. C).

Mr. Whitfield has "no clinical role" and does "not see or treat inmates."  *Id.*

at 1.  He does, however, attend meetings of the Impaired Inmate

Committee[11] and was present when Plaintiff "presented a claim about not

receiving tinted glasses."  *Id.* at 2.  Mr. Whitfield said that it is not his

"responsibility to order the optometrist to order sunglasses or tinted lenses

when they are not necessary."  *Id.*  His "responsibility would be making

sure the patient received his glasses if they were ordered."  *Id.*  Further, Mr.

Whitfield also said that he "had no reason to second-guess or override the

medical judgment of the optometrist" as he is "not trained in optometry."  *Id.*

Mr. Whitfield notes that Plaintiff had asked him "to sit in on an

examination by Dr. Schlofman, the optometrist."  ECF No. 33-5 at 2.

Because it "was not necessary," Mr. Whitfield "did not attend the exam."  *Id.*

---

[11] "This committee meeting is designed to give impaired inmates an opportunity to present their situation in front of the warden and the department head."  ECF No. 33-5 at 2.

In opposition to the summary judgment motion, Plaintiff also filed an affidavit.  ECF No. 42 at 7-9.  Plaintiff states that he was housed at Sumter Correctional Institution from September 2013 through November 2015.  *Id.* at 7.  During that time period, and through March 26, 2014, "Corizon had no optometrist contracted to work at Sumter C.I."  *Id.* at 8.

Plaintiff also states that Dr. Machado-Pellot never physically examined him.  ECF No. 42 at 8.  He states that she wrote him a "pass based on the previous optometrist consults."  *Id.*  He states that she provided him pain medication to the "pain caused by his damaged eye."  *Id.*  He contends that the health care policy does not allow "doctors to issue medical passes without a proven medical need."  *Id.*  Plaintiff also claims that Dr. Machado-Pellot "created an environment where [he] was treated as [a] nuisance when she placed him on the problem list."  *Id.*

**Analysis**

Plaintiff's claim is that Defendants violated his Eighth Amendment right to adequate medical care by failing to treat his eye pain, blurry vision, and headaches.  ECF No. 1 at 13.  Deliberate indifference to the serious medical needs of sentenced prisoners violates the Eighth Amendment's prohibition of cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  A "'serious' medical need is

one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D. N.H. 1977)).   A "serious medical need" may also be established if "delay in treating the need worsens the condition" or "if left unattended, poses a substantial risk of serious harm." Mann v. Taser Intern., Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (citing Hill, 40 F.3d at 1188-89, and Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)).

The concept of deliberate indifference entails something more than negligence, but is satisfied by something less than actions undertaken with an intent to cause harm. Farmer v. Brennan, 114 S. Ct. 1970, 1978 (1994). Subjective recklessness, as defined in criminal law, is the standard which must be shown for an official's actions to rise to the level of deliberate indifference. Id. Deliberate indifference has been described as a culpable state of mind of the defendant to unnecessarily and wantonly inflict pain or harm to a prisoner by depriving him of a basic human need. Wilson v. Seiter, 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

Combining the standards from <u>Farmer</u> and <u>Estelle</u>, the Eleventh

Circuit has held that there are four requirements to state an Eighth

Amendment claim for the denial of medical care: "an objectively serious

need, an objectively insufficient response to that need, subjective

awareness of facts signaling the need, and an actual inference of required

action from those facts."  <u>Taylor v. Adams</u>, 221 F.3d 1254 (11th Cir. 2000),

*cert. denied*, 531 U.S. 1077 (2001); <u>Farrow v. West</u>, 320 F.3d 1235, 1243

(11th Cir. 2003).  Put another way, once a prisoner shows that he has a

serious medical need, "the prisoner must prove three facts: (1) subjective

knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by

conduct that is more than mere negligence."  <u>Brown v. Johnson</u>, 387 F.3d

1344, 1351 (11th Cir. 2004) (citing <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255

(11th Cir. 1999)).

Medical malpractice does not constitute deliberate indifference.

<u>Estelle</u>, 429 U.S. at 106, 97 S. Ct. at 292.  "Nor does a simple difference in

medical opinion between the prison's medical staff and the inmate as to the

latter's diagnosis or course of treatment support a claim of cruel and

unusual punishment."  <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir.

1991) (citing <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1033 (11th Cir. 1989)).  For

example, in <u>Estelle</u>, the prisoner received treatment for his back injury (bed

rest, muscle relaxants and pain relievers), but complained that more should

have been done in the way of diagnosis, such as an X-ray or other tests.

The Court rejected this as a basis for liability:

> But the question whether an X-ray--or additional diagnostic
> techniques or forms of treatment--is indicated is a classic
> example of a matter for medical judgment.  A medical decision
> not to order an X-ray, or like measures, does not represent
> cruel and unusual punishment.

429 U.S. at 107, 97 S. Ct. at 293.  "An inmate who complains that delay in

medical treatment rose to a constitutional violation must place verifying

medical evidence in the record to establish the detrimental effect of delay in

medical treatment to succeed."  Hill, 40 F.3d at 1187.

Not responding to complaints of pain is an Eighth Amendment

violation and qualified immunity is unavailable.  McElligott v. Foley, 182

F.3d 1248, 1257 (11th Cir. 1999) (noting that "a jury could find that the

medication provided to [the prisoner] was so cursory as to amount to no

care at all.").  Thus, when a defendant is aware that the pain medication

provided is not treating the prisoner's pain but does nothing more to treat

that pain or respond to a deteriorating condition, it violates the Eighth

Amendment.  An "official acts with deliberate indifference when he or she

knows that an inmate is in serious need of medical care, but he fails or

refuses to obtain medical treatment for the inmate."  McElligott, 182 F.3d at

1255 (citing <u>Lancaster v. Monroe County, Ala.</u>, 116 F.3d 1419, 1425 (11th Cir. 1997)); <u>Mandel v. Doe</u>, 888 F.2d 783, 788 (11th Cir.v1989).

It is true that when an inmate has received some medical care and the dispute involves the adequacy of the care, federal courts are reluctant to second guess medical judgments and find an Eighth Amendment violation.  <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1507 (11th Cir. 1991); <u>Waldrop</u>, 871 F.2d at 1035.  "Hesitation does not mean, however, that the course of a physician's treatment of a prison inmate's medical or psychiatric problems can never manifest the physician's deliberate indifference to the inmate's medical needs."  <u>McElligott</u>, 183 F.3d at 1259 (quoting <u>Waldrop</u>, 871 F.2d at 1035).  Thus, liability cannot be avoided simply by pointing out that *some* medical care was provided, however cursory or insufficient that care.

Here, Defendants contend that "Plaintiff's old toxoplasmosis would not pose a substantial risk of serious harm if left unattended, it is not an objectively serious medical need."  ECF No. 33.  That argument should be rejected.

Dr. Machado-Pellot's affidavit establishes that toxoplasma "can reactivate causing inflammation, pain, redness, sensitivity to light, blurred vision, and increased intraocular pressure."  Plaintiff has a history of

toxoplasmosis and already suffered the loss of vision in his right eye "due to previous retinal scarring that had occurred due to toxoplasmosis."  ECF No. 33 at 4.  Plaintiff was complaining of pain,[12] blurred vision, and continually requested renewals of Excedrin for headaches.  There is a genuine dispute of material fact as to this issue.  Viewing the evidence in the light most favorable to Plaintiff, his eye condition appears to be a serious medical need.

The more problematic issue is whether Plaintiff has shown that the Defendants were deliberately indifferent to that need.  Mr. Whitfield and Dr. Webster are not medically trained and have no authority to render medical care or prescribe medications.  There is no evidence that either Defendant knew Plaintiff was in need of medical care and was deliberately indifferent to Plaintiff's needs.  Plaintiff contends that those Defendants knew he had a valid pass for solar shields, but made no effort to have them ordered.  ECF No. 42 at 5.  Despite that argument, there is no evidence in the record demonstrating that either Defendant had either the ability or authority to order or otherwise provide Plaintiff with a product when

---

[12] Dr. Machado-Pellot states that there was "no indication of eye pain" in October 2013, but the record demonstrates Plaintiff frequently complained of pain and requested refills of Excedrin, a pain medication, which was consistently refilled.

Plaintiff's doctors had not done so.  Summary judgment should be granted in their favor.

On the other hand, Dr. Machado-Pellot is a medical doctor and was the treating physician at Sumter Correctional Institution.  There is no evidence that Dr. Machado-Pellot ever physically examined Plaintiff. Indeed, Plaintiff's evidence is that she never gave him any examination. Without conducting an examination of Plaintiff or performing any tests, it is unclear how Dr. Machado-Pellot would be unable to determine whether or not Plaintiff's toxoplasmosis was active or not, a determination that should have been made considering Plaintiff's headaches, pain, and blurred vision.

The evidence further reveals that Plaintiff was seen in sick call on October 17, 2013, just after his transfer to Sumter C.I.  It is undisputed that Plaintiff had a pass for solar shades and sunglasses since 2011, but his solar shades had been taken prior to arrival at the institution.  It is unclear why the solar shades would have been taken from Plaintiff since he had a pass, yet it is more problematic that they were not provided to him when requested, repeatedly.

It is reasonable for medical staff to determine whether or not Plaintiff still had a need for the solar shades, but that was not done in a reasonable

manner.  The evidence reveals Plaintiff was subjected to extensive delay.

Although Dr. Machado-Pellot requested Plaintiff's vision be checked, that

did not happen for three months.  Then, after confirming Plaintiff's visual

acuity and blindness, Dr. Machado-Pellot referred[13] Plaintiff to an

optometrist, but did not request an evaluation for solar shades.  Instead,

after receiving the consultant's report in March 2014, she waited for the

one year follow up examination which was scheduled for March of 2015 to

request evaluating Plaintiff for solar shields.  That is peculiar in light of the

fact that she issued Plaintiff a pass for solar shields.  Doing so is

tantamount to providing a prescription which a patient could never fill.

Plaintiff was provided pain medication by Dr. Machado-Pellot, and

on a regular basis.  There is conflicting evidence as to whether the

Excedrin was provided for migraine headaches or, as Plaintiff's affidavit

declares, provided "for pain managment [sic] for the plaintiff's pain caused

by his damaged eye."  ECF No. 42 at 8.  Thus, Plaintiff's pain was not

---

[13] It may be assumed that such a referral was in accordance with departmental policy.  In relevant part, the policy states: "Inmates with an uncorrected visual acuity of 20/60 or worse in either eye will be referred to an optometrist."  ECF No. 33-3 at 1. However, the policy also provides that inmates who complain of blurred vision or "pain in or around the eyes" should be referred to an ophthalmologist.  *Id.*  Plaintiff arrived at the institution complaining of blurry vision and frequently requested pain medication, which was provided.  It is unclear whether the paid was "in or around the eyes," but viewed in the light most favorable to Plaintiff, it is accepted that Plaintiff's pain was eye pain as he stated in his affidavit.  Regardless of whether it was an optometrist or ophthalmologist, Plaintiff was evaluated by an eye doctor.

entirely ignored as he was given Excedrin, yet when viewing the evidence in the light most favorable to Plaintiff and giving all "justifiable inferences" to Plaintiff, a jury could reasonably conclude that Plaintiff's ongoing pain was associated with his eye discomfort, and that Dr. Machado-Pellot was deliberately indifferent to Plaintiff's plight.

The evidence shows that Dr. Machado-Pellot was aware that Plaintiff had previously been diagnosed with toxoplasmosis and knew he had been issued passes for solar shades which were, presumably, wrongfully taken since Plaintiff had a pass.  She knew that Plaintiff was requesting to have the shades replaced and, in making those repeated requests, he advised medical staff that he continued to have blurry vision and, by implication, pain for which he requested Excedrin.  She was also aware that Plaintiff sought a pass for an "indoor job" which, giving the justifiable inference to Plaintiff, shows that he was suffering from sensitivity to light.  Although Dr. Machado-Pellot renewed the solar shades pass for Plaintiff as requested, it was of no benefit without receiving the solar shades.  Although she referred him to an optometrist, she did not request that Plaintiff be examined for the problem for which he went to sick call: to have solar shades.  A year later, in 2015, Plaintiff was evaluated again by an eye doctor and, for the first

time, informed that solar shades were not allowed, notwithstanding the fact

that Plaintiff had been given passes for them since 2011.

The evidence demonstrates Plaintiff's eye care and evaluation was

delayed, and no reason was provided to explain that delay.  The evidence

shows Plaintiff was experiencing continued pain and discomfort during that

period of delay.  Dr. Machado-Pellot has not demonstrated that she is

entitled to summary judgment and there are genuine disputes of material

fact.  "A core principle of Eighth Amendment jurisprudence in the area of

medical care is that prison officials with knowledge of the need for care

may not, by failing to provide care, delaying care, or providing grossly

inadequate care, cause a prisoner to needlessly suffer the pain resulting

from his or her illness."  McElligott, 182 F.3d at 1257.  There is a genuine

dispute as to whether Dr. Machado-Pellot caused Plaintiff to needlessly

suffer with eye pain and discomfort.  The motion for summary judgment

should be denied as to this Defendant.

**Recommendation**

In light of the foregoing, it is respectfully **RECOMMENDED** that the

motion for summary judgment, ECF No. 33, be **GRANTED in part** and

**DENIED in part**.  The motion should be granted as to Defendants Don

Whitfield and Dr. Jimmy Webster, but denied as to Dr. Veronica Machado-

Pellot.  It is further **RECOMMENDED** that this case be **REMANDED** for

further proceedings.

      **IN CHAMBERS** at Tallahassee, Florida, on January 20, 2017.


        S/     Charles A. Stampelos       
        **CHARLES A. STAMPELOS**
        **UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

      **Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  See 11th Cir. Rule 3-1; 28 U.S.C. § 636.**